

Mr. Lester Fletcher
1*571-***-****
LesterFletcherCareer@Gmail.com
28 U.S.C. § 1654

FEB 1 6 2021

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND

### 6500 CHERRYWOOD LANE

### GREENBELT, MARYLAND 20770

Good Day Your Honor Grimm,

I first want to properly thank the court for allowing me to amend my complaint. The time was absolutely needed.

Also, the weather has been snowy lately, so I did rush at the last minute to get my "Amended Complaint" in on

time. In addition, I cited *See Rule 26(e): Parties are given chance to correct any wrong information that may have*

*been submitted*. So, hopefully I can take the time to point out some corrections made before sending the Defendant a

"clean copy" of my Amended Complaint."

Corrections made on each page is in parentheses and underline:

1. Page 3. (*and*)                          9. Page 19. (*that*)

2. Page 7. (*and put back*)

3. Page 8. (*and put back*)

4. Page 9. (*March 14th ,2019*). (*Mark and Susie*)

5. Page 10. (*Complaint*) (*office furniture*)

6. *Page 16. (trainer)(the)*

7. *Page 17. (Office)*

8. Page. 18. (*discriminatory*) (*position after the porter contract breached*)

Respectfully Mr. Lester Fletcher

Mr. Lester Fletcher
1*571-***-****
LesterFletcherCareer@Gmail.com
**28 U.S.C. § 1654**

FEB 1 6 2021

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF MARYLAND**

**6500 CHERRYWOOD LANE**

**GREENBELT, MARYLAND 20770**

LESTER FLETCHER,

          Plaintiffs,

vs.

DIDLAKE INCORPORATED, INC

          Defendants,

Case No.: Civil No. 8:2020-cv-3446-PWG

CIVIL: DISIABILITY DISCRIMINATION AND
RETAILATION CHARGE. DIDLAKE'S FAILURE
TO ACCOMMODATE A DISABILITY CLAIM!

**PLAINTIFF'S AMENDED INITIAL COMPLAINT: Exhibit A**

_____

Pro se, Mr. Lester Fletcher

Section **1654**     **28** U.S.C. § **1654: Date:** 2/10/2021

**Plaintiff, proceeding by** Section **1654 28** U.S.C. § **1654, "have the right to present arguments**

**as pro se in a civil case in a federal court** _:Exhibit A Complaint: Violation of Plaintiff's Civil_

_Rights;_ Under Title VII of the Civil Rights Act of 1964 EEOC EDITOR'S NOTE: The following

is the text of Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended,

as it appears in volume 42 of the United States Code, beginning at section 2000e. Title VII

prohibits employment discrimination based on race, color, religion, sex and national origin. The

Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009

1

Case No.: Civil No. 8:2020-cv-3446-PWG

(Pub. L. 111-2) amend several sections of Title VII. In addition, section 102 of the CRA (which is printed elsewhere in this publication) amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of **intentional violations of Title VII, the Americans with Disabilities Act of 1990, and section 501 of the Rehabilitation Act of 1973. Cross references to Title VII as enacted appear in italics following each section heading. Editor's notes also appear in italics. In conjunction with DC Law Violations.** *According to DC LAW § 28:2-206 Contract Offer and Acceptance and* **Law § 7–751.13. Breach of contract. D.C. Law 17-219 and Retaliation. These acts lead to the Plaintiff being Constructively Discharged.**

## AMENDED COMPLAINT:

Plaintiff, proceeding by Section 1654 28 U.S.C. § 1654, "have the right to present arguments as pro se in a civil case in a federal court", the Defendant's Motion filed on January 12, 2021 to dismiss with Prejudice. This Court has Subject Matter in this case, and the plaintiff presents his Amended Complaint, it is sufficient governing the standards grounds for, ***Federal Rule Civil Procedure 8(a), (2)(3);*** The plaintiff adequately presents DIDLAKE'S violations of his Civil Rights and sought for RELIEF. Accordingly, the plaintiff moves the courts to grant his motion to COMPEL and DISCOVERY.

*F*ederal Rule Civil Procedure 8(a); by being" ***(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which***

Case No.: Civil No. 8:2020-cv-3446-PWG

*may include relief in the \*alternative or different types of relief." See ECF 1 (\*Jury Trial Requested, \*alternative); and that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).  In the Supreme Court the Justices has interjected that the plaintiff's complaint needs only to "give the defendant fair notice of what the plaintiff's claim is and the grounds it rests," [i]*

### Procedural History

From the plaintiff's Equal Employment Opportunity Commission's (EEOC Charge Number. 846-2020-06346), for Retaliation and Failure to Accommodate. The plaintiff was issued a Right to Sue letter on August 26th, 2020. The plaintiff sent his certified mail on November 20th ,2020 and filed a Motion in the District Court of Maryland, against Didlake INC, for Retaliation and Failure to Accommodate. On January 13th ,2021 the plaintiff called the courthouse _(and)_ found out that the Defendant filed a Motion to dismiss; the plaintiff was told that the date filed was January 12th ,2021. The plaintiff received a copy in the mail on January 14th ,2021. The Defendant received their copy of the plaintiff's initial statement on November 24, 2020 at 7:56 AM; Tracking Number: 9405511899564174461544. On January 15th ,2021 the Judge issued a "LETTER ORDER", as of this day, the plaintiff's Motion to Compel and Discovery is still in the court's traffic; the Defendant has a set of court dates to respond to the plaintiff 's amended Complaint. The

3

plaintiff's Disability Civil Lawsuit Discrimination Case No.: 8:20-cv-03446-PWG is currently proceeding.

ECF 1 EXHIBIT B shows that the position offered on September 6, 2018 is incredibly detailed. For one it states, ***"This employment offer is contingent upon the satisfactory outcome of the pre-employment screening activities (including references check of former employment, verification of ability to work in the United States and background check OR criminal history check OR fingerprint check). Any misrepresentation of an individual's or credentials in securing employment may be grounds for dismissal."*** See ECF 6 EXHIBIT F shows that the plaintiff passed his federal background check, for the Porter contract position 05203. The plaintiff keeps to his part of the employment contract's agreement.

### *Comes now Mr. Lester Fletcher the Plaintiff, and files this complaint against DIDLAKE, INC. and for the cause would show as followed.*

The plaintiff was notified by the Defendant on September 6, 2018 and offered a position as a "Porter" for the White House. The plaintiff Mr. Lester Fletcher accepted the position in consideration that it would only be given to him if he passed the federal background check; **See ECF 1 Exhibit B**. The plaintiff signed Didlake's employment contract to seal the position until his federal background check came back cleared. In consideration with this mutual agreement, the covenant was broken and became a breach of contract. Didlake broke the law and

4

did not honor (contract 05203) for the Porter position+paying $17.50 an hour at the White House.

The position was given to another hiree without Mr. Fletcher's acknowledgement.

According to *DC LAW § 28:2-206. Offer and acceptance in formation of contract.*

*(1) Unless otherwise unambiguously indicated by the language or circumstances:(a) an offer to*

*make a contract shall be* **construed** *as inviting acceptance in any manner and by any medium*

*reasonable in the circumstances; (b) an order or other offer to buy goods for prompt or current*

*shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the*

*prompt or current shipment of conforming or non-conforming goods, but such a shipment of*

*non-conforming goods does not constitute an acceptance if the seller seasonably notifies the*

*buyer that the shipment is offered only as an accommodation to the buyer.(2) Where the*

*beginning of a requested performance is a reasonable mode of acceptance an offeror who is not*

*notified of acceptance within a reasonable time may treat the offer as having lapsed before*

*acceptance.* **Statute of Limitations** – In Maryland, the usual Statute of Limitations for filing suit

is 3 years, though there are some exceptions: D.C. Law § 7–751.13. Breach of contract. D.C.

Law 17-219 rewrote subsec. (b), which had read as follows: "(b) A participant found in breach of

contract is liable to pay the District of Columbia the difference between the lump sum payment

for the year of obligated service and a prorated amount for the days of service obligation left

unfulfilled, beginning on the date the participant caused a breach of contract.

In addition, nothing in this contract states that if an individual who had applied for employment

with DIDLAKE INC, while waiting on a background check; may lose their position to another

5

applicant whose background may comeback cleared before theirs. Nothing in this contract states that if the position offered in this contract dated *September 6, 2018* for the Porter position; that the vacancy must be filled at a certain time, that this offer maybe withdrawn or another position of the same or less value will be given in its place. Nothing in the employment contract states, how Didlake and the job seekers may resolve their disputes if any at any time should arise. *Only for the plaintiff to be told seven months later that his backgrounds check was cleared and that he is ready to start work*. (the plaintiff was EXCITED; he wrote about it on twitter (and kept other tweets). *Later that same day the plaintiff received a call back from Cathy Salter (**she over seen the performance of the plaintiff's Federal Government Background Check**), anyway; Mrs. Salter told the plaintiff that she is sorry, the position is no longer available.* The plaintiff argued "why didn't anyone from Didlake call or email me?" However, the Porter position offered did take the plaintiff through a long, exhausting process of expectation to start working and its benefits, it was complete negligence on the Defendant and their intent. The plaintiff was not informed by Didlake until his background check was cleared several months later that, contract 05203- the Porter position was given to another applicant. Though DIDLAKE did insert in the employment contract agreement that this employment letter offer is not to be construed with as a contract, BUT by law that is exactly what it is; a contract for employment with DIDLAKE and they breached it.

*According to Legal Dictionary dot net*. The existence of a Valid Contract is when; an offer is presented **See ECF 1 Exhibit B:** 2). **Acceptance of the offer**; the plaintiff accepted and signed

6

for the porter position approximately mid-September 2018. Approximately before mid-September 2018 the plaintiff had received a phone call from DIDLAKE informing him that, for DIDLAKE to hold the position for him that he must sign and accept it, or it will be generated (*and put back*) into the system for another applicant. So, the plaintiff signed for the Porter position and waited. 3). **Consideration.** Didlake and the plaintiff considered that when the background came back cleared that the plaintiff would start working at the White House for the Porter position. In return the plaintiff allowed DIDLAKE to perform a thorough background federal check, in response to their pleasure to offer the plaintiff the Porter position at *EWWWW* (a different location from where the plaintiff end up working), "the plaintiff skills and experience will be among our most **value** assets." That is what DIDLAKE wrote in their offer contract. They were gaining a qualified individual of value for the Porter Position. **(A) The breach caused or is likely to cause substantial harm to the aggrieved party; or (B)** The breach substantially deprived or is likely substantially to deprive the aggrieved party of a significant benefit it reasonably expected under the contract. [ii] The Defendant failed to live up to the agreement in the Porter position (individually) contracted as 05203 [iii].

      **On November 16, 2018**, as part of the hiring process, the plaintiff provided a letter from his doctor confirming his disability, (as a part of Didlake Hiring Intake, it was mandatory, he was told) at this time the plaintiff also requested reasonable accommodations for his disability. *Throughout this time, he had kept in contact with Didlake's hiring intake Toshara Layne diligently, email after email, phone call after phone call. Nothing was confirmed to him*

7

*that the position 05203 contract offered to him was taken or filled.  He kept calling for his start date as a Porter paying $17.50 an hour.* **See Exhibit C Reserved**

Didlake provided their acceptable guidelines for the plaintiff's accommodation request that his *Dr.* had to signed off on. On November 20th,2018 an email from Toshara Layne clearly spelled-out what the plaintiff's *Dr., must* confirm in his disability letter for him to be hired; **See ECF 4 Exhibit D, "of that a less restricted example of a doctor letter would look like",** (*clearly, Toshara was analyzing from the plaintiff's doctor' original restrictions*), Toshara said that DIDLAKE could reasonably accommodate me if my doctor made his restrictions less as to her example. The plaintiff's doctor did.

The plaintiff's doctor revised the initial letter to Didlake, and it was sent by fax on December 10th, 2018. The date of 11/16/18 was not revised on the Disability Accommodation Letter. He faxed over the revised letter; all this information the plaintiff's Doctor has on file; **See ECF 5 Exhibit E.** However, when the plaintiff was informed that his background check came back clear there was no mentioning of his initial position offered (as a White House Porter, that it was taken; not util after the background check).

Approximately around February 28[th,] 2019, the plaintiff had received a call from Cathy Salter confirming his background clearance was good to go and that he should be starting to work in a week; **See ECF 6 Exhibit F.**  Later that day the plaintiff received a call back from Cathy Salter saying that the Porter position was no later available to him and she needed him to report to work sooner. At this time, the plaintiff had told Cathey Salter that, he had Doctors' appointments he

8

Case No.: Civil No. 8:2020-cv-3446-PWG

must first attend. He was told that Didlake could work something out and that he needed to start

early, a week from the first date given. Approximately (*March 14th,2019*).

 The plaintiff was informed that his start day would be March 4th, 2019 by email. The plaintiff

told Cathey Salter that Didlake mislead him to believe that the Porter position was still his up

until this date even after knowingly they gave the job to someone else. The communication from

Toshara Layne and the plaintiff, also spoke about his initial offer letter and that he could still use

that letter because he was in the hiring process. Six months the plaintiff waited for the Porter

Position; **See ECF 11 Exhibit K page 2**.

                ... the plaintiff was instructed to report to work at a lower rate of pay of $13.83

and given a different job contract (there was no mentioning in any form from Didlake that, this

new contract replaces 05203); and at a different location on March 4, 2019. "I had to report to

Sandra White the Project Manager." Within a week of work for Didlake, the plaintiff took ill and

was placed on a seven days' home recovery until his symptoms cleared up. The plaintiff had

spoked with Mark and Susie in Human Resources at Didlake and they gave him hell. Saying that,

the plaintiff was not supposed to be hired according to his doctor letter restrictions, (that they

accepted) they said that it was too restricted. The plaintiff was told by Susie that information was

in his personnel file that he declined the Porter position at a pay rate of $17.50 hour and said that

the work was too much. That he had worked with Ms. Betty Williams on night shifts and did not

like it. The plaintiff told Susie that his start date was March 4, 2019. Prior to that he never

worked for Didlake and does not know who she is talking about. Susie did say that the person

9

worked with Betty Williams, (So, who was the applicant that filled the Porter position (05203); I AM like Shaggy "***It Wasn't Me!***"

The plaintiff was not reasonably accommodated. The only thing the plaintiff was not allowed to do anymore was vacuuming after his training (vacuuming, in which was not done every day and, in every unit (s) or room (s),); ***at times, the plaintiff still was told to vacuum when there was a call-out or something***. The defendant has the plaintiff's time sheets on his assignment sheets to prove the plaintiff's complaint. Each room the plaintiff removed trash from has the time entry and exit of each room. The plaintiff was still performing multiple twist and turns in with his lower back. He was instructed to remove pallets boards with heavy objects on them weighing up to 100 pounds or more, the plaintiff lifted and dumped loads heavy old computers, any (*office*) furniture that was trash in the hallways he removed as well. The plaintiff argued that, that was another contractor's job.

Some of the plaintiff's work was performed under the eye of his supervisor Mrs. Ilene. He was told that he had to perform these work acts because it was in his job description, among other things the plaintiff was assigned to due. The plaintiff body was so sore from these activities that his body pained. The plaintiff verbally complained to his supervisor and project managers throughout his time employed at Didlake up to May 31, 2019. Doing this time, the plaintiff's family had moved back from North Carolina and he had rent to pay or get evicted (*long story*). The plaintiff fought with that job for as long as he could. Some of his co-workers complained about the same abuse of authority from Didlake management. Didlake did not take the proper time to accommodate the plaintiff and his disability, they just put him to work

10

wherever they needed him. They violated his doctor's orders and his civil rights under Title VII. The plaintiff has witnesses that have seen him perform these duties, that he would like to call forth.

**The plaintiff's doctor clearly detailed the plaintiff's restriction that needed to be accommodated: The plaintiff's Disability Accommodation That Was Not Met.** [iv]

1. **No work task that is requiring repeated bending down, kneeling, crutching down to complete a task:** However, Didlake went against the plaintiff's doctor letter that they hired him on. The plaintiff received a 32-gallon Big Trash Can on wheels and a Universal Toter Tilt Trash Truck on three wheels. To help complete his DAILY assignments for Didlake Inc. These trash cans where being filled sometimes two to four times a day, weighting over 50 lbs. taking them back and forth to the trash dumpsters, lifting the trash bags out of the trash cans to dump downstairs in the outside dumpsters, thanks to Holy God for the elevators.

2. **No carrying, pushing, lifting, or pulling where force required exceeds 20 lbs.** *See* **(1.)**

3. **No work task that requires lifting of 20 lbs. or more:** Approximately mid-May after the plaintiff was pulled in the office and told that he was being a "Troublemaker" (and being called trouble at work by peers), yes about mid-May of 2019 the plaintiff was given work orders from his Supervisor to remove pallets from room 333 on the Secret Service floor, and the old computers and the boxes they came in downstairs to the

11

dumpsters because that same day a shipment from UPS of new computers came in " the old computers the plaintiff trashed", by himself with no one to help him. This assignment from Didlake took about two to three trips alone. Lifting and pulling the weight the computers drive and monitors and taking them downstairs. Didlake violated the plaintiff's disability accommodation restrictions again because that exceeded the plaintiff's disability restrictions lifting, twisting, pulling and struggling with over 20lbs, or consistently. The plaintiff mangers were retaliating against him from the May 1, 2019 write up and about discussing D.C. wages of a pay increase to $14.00 hr., his tardiness' and absents, (some of the plaintiff's absents and or tardiness was because of a love one passing and late trains, broken down trains, forgot his wallet, forget his Federal ID, etc.,) The plaintiff always called in when running late or got sick and informed someone by mutual voice exchange.

4.  **No work task the requires repeated twisting of torso to complete.**

5.  **He shall be allowed to walk at a slow pace and not be required to run jump, may climb stairs to access upper/ lower floors but shall be allowed time to rest after climbing stairs.**

6.  **No work task that requires climbing ladders/ step stool.**

7.  **Mr. Fletcher shall be allowed 10 minutes rest break after 2hrs continuous walking and standing.** The plaintiff was not given 10 minutes break after 2 hours of working for DIDLAKE during his regular job duties. In fact, he was questioned for resting one

time during obviously considering his doctor's notice. But was told that he needs to be

getting busy. No one asked how long he was resting for or if he was feeling well or if

he was in any pain.

8. The plaintiff was placed in a "Hostile Work Environment" with Didlake after his

complaints. In Mid-April 2019, the plaintiff asked questions about the $14 pay raise

that was supposed to happen in October of 2019. Didlake Inc, basically, telling the

plaintiff to keep his mouth shut and do his job[v].

**See Exhibit G** A couple of weeks later he was written up for taken off the for the first

week of his employment with Didlake. The plaintiff was written up for abuse of

absence that was beyond his control. It was retaliation from Didlake because of his

questioning about his job pay and work assignments, he performed for them, that, they

agreed to. No heavy lifting among bending and other duties that can cause additional

injuries to his body. The plaintiff was not allowed to take the breaks his doctor

informed Didlake that he had to. However, Didlake agreed to this Disability Letter by

hiring the plaintiff and accepting his Doctor Disability letter (Toshara Layne told the

plaintiff if he does not submit proof of his disability that, they could not hire him.)

Betty William yelled at a deaf employee in the office by the time clock and brushed

him off with the back of her hands like he was a cat that jumped on her lap *(sorry I AM*

*keep having flashbacks)*. The plaintiff can call for witnesses management treat others

badly to. Didlake is also aware of all the plaintiff's medical information.

13

Prior to the plaintiff's retaliation write up on approximately May 1, 2019 (in which the defendant submitted no evidence of dates) for being tardy and absence. (and the plaintiff former manager Sandra White also told him that, she did not write him up, management did, and she signed off on it). The Plaintiff had testified *"I was being intimidated about write ups and how people get promoted and my mangers telling me they received nothing about his accommodations, they two said that I was being a troublemaker and starting confusion, on said Ms. Betty and Ms. White. I was told that all medical records and personnel files were in the Manassas, Virginia office by my Project Manager Sandra White. Didlake also had Sandra White to having a meeting about the pay to $14.00 increase come October 2019. In this meeting Mrs. White said that an employee questioned the D.C. payrate (all my former co-workers knew she was talking about me, they looked at me!). Yes (I) the plaintiff felt as if he did something wrong, but the plaintiff is in his lawful rights to ask his former co-workers questions."* On DIDLAKE'S office wall at EEOB there is a EEOC discrimination BOARD and Washington D.C pay rate scale. It READ "FOR ALL TO READ", big as day. "So, I inquired about a pay increase to $14.00 come October 2019 (the bulletin was on the wall by the time clock), to my former co-workers. They got excited and said they never read it. Then they started asking management about an increase to $14.00 hour. Management asked, "who did they hear this from?" Management got upset and that is when I was called into a last-minute interrogation with Ms. Betty and Sandra White, stated upon this page." *I was told that I could not be asking my co-workers how much they make. I never did such a thing. I did in quire about their position and whether*

*we get pay rises.* In addition, on the same wall with the D.C. pay rate and EEOC policies there was a memorandum that read. Employees may discuss other employees pay and not be disciplined. Again, I had not. Not to lose track of my argument in reply. [1]. Didlake waited until after they retaliated against me for question Federal Work Policies with my co-workers and reprisal again on May1, 2019 for tardiness and absents that had happen in March and April of 2019." *Without sufficient evidence of willful and wanton disregard of an employee's obligations or gross indifference to the employer's interest, there can be no findings of gross misconduct or intentionally actions." Lehman v. Baker Protective Services, Inc., 221-BR-89. "It is proper to note that what is deliberate and willful misconduct' will vary with each case. Employment Sec Bd. V. LeCates. 218 Md. 202, 207 (1958) (1958) (internal citation omitted), also see Hernandez v DLLR, 122 md. App. 19. 25. (1998). Maryland Labor Board (Case #1203846 Mr. Lester Fletcher v Maryland Unemployment Commission).* In light, the plaintiff was not being malice or intentionally missing days from work or being tardy. The plaintiff had his doctor's order to follow. The plaintiff is dealing with a medical condition which is beyond his reasonable control, this is what caused his tardiness and absents in conflict with not being accommodated. Didlake

---

- [1] 1989 – *Brookshire Grocery v. Mark Moise.* Mark Moise noticed several sheets containing wage increase information in a supervisor's office. Moise did not commit trespass to access the payroll information, which was kept in a location that he routinely entered as part of the normal course of his duties. He copied the wage information concerning each employee and then shared the information with several employees. He was terminated by his employer, but the NLRB ruled that the employer could not prohibit employees from discussing wages. They also found that the interrogation of several employees about the incident violated Section 8. [§ 158.] (a) (1) of the <u>NLRA</u> by interfering with, restraining, or coercing "employees in the exercise of right guaranteed by the NLRA" Also cited NLRA or the Act; 29 U.S.C. §§ 151-169

15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

never at any time sat with the Plaintiff to discuss accommodating his disability in the physical workplace. Instead Didlake left the plaintiff with a trainee who had no knowledge of his disability restrictions, just like my supervisor and manger may had not.

After all the plaintiff's complaints in between, he had requested a uniform jacket because at times when he went out to dump all the trash, it was many times where it was pouring down raining and thundering and LIGHTNING, the plaintiff was soaked and had to catch the train and bus home. The plaintiff was told that he was not a lead employee so he is not getting a jacket and that no other jackets can be worn with his uniform while on the clock for Didlake because his name tag has to be exposed.

   The plaintiff took sick throughout these times but still had to report to work or be fired and or evicted. Because Didlake does not honor the plaintiff's official Doctor's Disability Letter.

      May 29th, 2019 or May 30th the plaintiff filled out a form to resign from Didlake in writing to be effective May 31, 2019. The plaintiff noted on his resigned paper that he wanted to explain to the President of Didlake about what was going on, but Didlake would not give him that information or contact link. The plaintiff recall trying to email and speak with the President of the company but Didlake management said that it was not allowed. However, the plaintiff did recall before leaving, (*I left*) a couple of messages for the President of Didlake Inc.

      The plaintiff never got a returned phone call from Didlake INC's Headquarter. The plaintiff was still performing in these unreasonable work conditions that violated his disability rights [vi]. He however did not have a problem working on the Secret Service floor for

16

Case No.: Civil No. 8:2020-cv-3446-PWG

by the White House. The federal workers on that floor gasped when the plaintiff told them that he was leaving, he vented to them countless times about what was going on downstairs with Didlake and management. It was not that he did not want to work. He did his job and more than he was supposed to at the time of his employment with Didlake. His Supervisor and co-workers did not want him to leave nor did some federal workers. The plaintiff just could not afford the risks of something going wrong against his doctor's disability restriction accommodation for his workplace. That the plaintiff; found to had caused him to be ill and with serve contractions of musculoskeletal bodily system pains during his employment with Didlake.

**See ECF 8 Exhibit H; On** May 31, 2019, the plaintiff was constructively discharged because of the intolerable working conditions and the Defendant's failure to reasonably accommodate him. Didlake may represent people with disabilities but they treated the plaintiff like horse manure. The plaintiff was compelled to resign because his health started getting worse from the stressful impact of his workload and hostile work environment. The plaintiff has been discriminated against because of his disability in violation of the Americans with Disabilities Act of 1990, as amended. The Plaintiff is requesting the District Court of Maryland to hear his case, and upon where no demand can be reached. The plaintiff will use his alternative; the plaintiff is requesting a Jury Trial.

*"Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended, as it appears in volume 42 of the United States Code, beginning at section 2000e. Title VII prohibits employment discrimination based on race, color, religion, sex and national origin. The Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) and the Lily Ledbetter Fair Pay Act of 2009*

17

Case No.: Civil No. 8:2020-cv-3446-PWG

*(Pub. L. 111-2) amend several sections of Title VII. In addition, section 102 of the CRA (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII, the Americans with Disabilities Act of 1990, and section 501 of the Rehabilitation Act of 1973". EEOC* www. eeoc .gov /statutes/title-vii-civil-rights-act-1964: **See ECF 9 Exhibit I; EEOC Complaint Attached. See also ECF 10 Exhibit J Right to Sue Letter**

*Continuing*; The plaintiff suffered with less pay, a complicated schedule, additional pain and suffering from his disabilities that were not accommodated. The plaintiff's unaccommodated (*discriminatory*) (*position after the porter contract breached*) caused the plaintiff to have to extreme irritated inflammatory issues with his medical condition due to not being accommodated. The plaintiff suffered with sharp back pain, lower back and inner thigh pain, muscle spasms in the hands. The plaintiff at times could not barely get up in the mornings to make it to work on time because of the soreness due to being forced to work against his doctors' order and not being accommodated. The plaintiff accepted the Porter position because it accommodated his Doctor appointments, being that the Porter position schedule gave the plaintiff Monday's off and working hours of 6AM to 2:30 PM and the plaintiff had in mind to use Mondays for his doctor appointments. With the less pay the last-minute position at Dwight D. Eisenhower Executive Office 17th and Pennsylvania Avenue, NW Washington, D.C. 20506. In which this last-minute notice position caused the plaintiff to miss doctor appointments, working from 8AM to 5:00 PM Monday through Friday. By the time the plaintiff got off, his doctor's offices were closed and when he took off from work for his doctor's appointments he was written up. The plaintiff made

18

Case No.: Civil No. 8:2020-cv-3446-PWG

DIDLAKE aware of his medical history and conditions, though the plaintiff was hired because of one of his qualified disabilities to work at DIDLAKE. Didlake cannot separate all the plaintiff's aliments to say that only a particular part of the plaintiff's disability is only impaired when working for their company. The plaintiff condition is a whole part of is health and being and cannot be broken down to one disability that may affect his job performances, the plaintiff is still suffering from his health condition that worsen because of not being accommodated by DIDLAKE. The plaintiff has right to believe also that the applicant who replaced him for the Porter position did not have an accommodation request for the position and it was given to him because of him not needing any additional doctor restrictions. It may be a big assumption but not far fetch and Discovery can clarify (*that*) allegations.

A. **Benefits That the Plaintiff Missed Out on For the Porter Position: Contracted as 05203:**

1.  Didlake gave the plaintiff confirmation of a starting salary of $17.50 an hour.

2.  Didlake Informed the plaintiff of his eligibility of overtime payment and all hours worked excessed 40 hours a week.

3.  Didlake displayed the plaintiff's date and time for work, 6 AM-2:30 PM Tuesday through Saturdays. 40 hours a week, fulltime.

19

4.  Didlake's offer dated September 6, 2018 also reads on medical and life insurance benefits the plaintiff is entitled to.

5.  Didlake presented the plaintiff with a work located at the White House and Betty Williams as his initial project manager.

6.  Didlake's offer was informative about termination of a Federal Badge at any time.

7.  In this contract agreement with Didlake the plaintiff was told what to wear on the first day and what documents to bring.

8.  Finally, Didlake's contract reads; please this letter should not be misconstrued with an employment contract and that it is an agreement with DIDLAKE INC; either or could end it at any time. However, the plaintiff was verbally informed by DIDLAKE INC, that, each position has its own contract. [2]

**B.  Didlake Incorporation is a NON-PROFIT ORGANIZATION**

Giving the fact that DIDLAKE INC, is a Non-profit organization that does not exempt them for illegal discrimination or breaking the law. According to the Do Not Panic Foundation,

---

[2] **Universal Citation:** VA Code § 59.1-507.1 Breach of contract; material breach.

(2) the breach is a substantial failure to perform a term that is an essential element of the agreement; or

20

Case No.: Civil No. 8:2020-cv-3446-PWG

"A nonprofit can be sued for discrimination by **employees**,

**volunteers**, **customers**, **vendors**, **people to whom it provides or refuses services**,

and **members of the public**. Members of a nonprofit board can also face lawsuits for

discrimination." https://www.bing.com/search?q=non-profit organization sued for discrimination

&qs=n&form=QBRE&sp=-1&pq=non-profit organization sued for discrimination &sc=3-

48&sk=&cvid=1DABBC7625F440A0B8AB0B8A7759EEF3

**Who Sues Non-Profit Organizations? Here is a list in the link** Who Sues Non-profit

Organizations? (victorinsuranceus.com)

## I.  **THE PLAINTIFF DID HAVE TO SUBMIT SUBSTATIATING MEDICAL DOCUMENTATION TO SHOW HIS QUALIFICATIONS.**

Yes, DIDLAKE a non-profit agency. The plaintiff did have to "submit substantiating medical

documentation to show his qualifications as someone with a disability for the Ability One

program;" In addition, the plaintiff's doctor sent DIDLAKE a copy of the plaintiff's medical

report for his disability. However, in light of the plaintiff's diagnose of his medical condition.

Mrs. Toshara Layne for DIDLAKE emailed the plaintiff and said that, the plaintiff disability

falls in-line with their Ability ONE program but the restrictions to accommodate him were

too restricted, See ECF 4 Exhibit D. (DIDLAKE KNEW AHEAD OF TIME ABOUT THE

PLAINTTIFF ACCOMMODATION REQUEST BEFORE THEY HIRED HIM.)  The

plaintiff's doctor wrote another doctor letter almost a month later. Explaining a less

restriction for the plaintiff to work for DIDLAKE. These restrictions had to be

21

Case No.: Civil No. 8:2020-cv-3446-PWG

1
2
3
4
5
6

accommodated, to help the plaintiff's disability in a physical work environment. DIDLAKE did hire the plaintiff under (their) Ability One Program for his disabling medical condition on March 4th, 2019 after the second doctor letter sent December 10th, 2018 but failed to accommodate him throughout his employment time at EEOB for Didlake Inc,

7
8
9
10
11
12
13
14
15
16
17

The plaintiff also recalls Susie Kennedy and Mark Gonzalez phone call with him. Approximately March 12th regarding his absents. They called the plaintiff and scheduled a phone meeting. Before scheduling the meeting, Susie was telling plaintiff that he should not return to work after his recovery as his doctor had ordered him. And that Susie and Mark (Not Eric) was going to give him a call back and will inform him if and when he should return to work. The plaintiff and Susie got into a little heated exchanged (as far the tone in one's voice), the plaintiff told Susie that he is going to return to work after his doctor order, and he was not staying home.

18
19
20
21
22
23

 A time was set for another phone meeting, Susie said the plaintiff should have not been hired because of his disability restrictions in this meeting. The plaintiff said that, that was irrelevant because he was already hired by Didlake. vii  The plaintiff is entering [ **EXHIBIT L** heavy trash cans the plaintiff used at all times as a part of his job duties.]

24
25
26
27
28

The plaintiff is in a protected class "He is African American (male)" and His co-worker (John Doe) is a white male with a disability as well. However, John Doe is being accommodated for his disability. He stands around all day and does nothing but dance to Michael Jackson, in his head. In some fairness John Doe have been seen wiping the trash cans and spending hours on cleaning the bathroom mirrors or doorknobs. So, how is that the plaintiff had not been

Case No.: Civil No. 8:2020-cv-3446-PWG

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

accommodated for his disabilities but (John Doe) have been? The plaintiff's other co-worker (Jane Doe, I think the spelling of her name is LeVia) is a black female and was accommodate for her disability "*****", the plaintiff does not know how severe her condition is. However, she was given a DIDLAKE INC work jacket to stay warm. DIDLAKE INC, knowing the plaintiff health condition refused to give him a jacket to take the trash cans and portable trash truck out to the dumpster in the pouring rain and sometimes thunder (in which the pouring rain had happen a few times during his EEOB employment; the plaintiff got sick), the plaintiff complained but was told that, he is not a lead by Ms. Betty Williams, so he could not get a jacket. Neither was LeVia, both the plaintiff and LeVia started the same day.

Regarding Confidentiality of Discovery Materials (Local Rules 104.13), the plaintiff would like to submit another protected class/ group he is in and how he discerned to be treated different. The plaintiff asks the Defendants to be cautious to; requested documents to be sealed [viii].

    The plaintiff also believes that, it will not had been an "undue hardship" for DIDLAKE INC, to accommodate him; John Doe worked at his own pace and no one bothered him. Beside they already had a lead worker working on the floor the plaintiff was scheduled to work the whole time of his employment there. Though the lead ended up somewhere else and the plaintiff had to pick-up and extra load from over 70 plus rooms twice a day: in the mornings and afternoons. That was a lot of back pain, bending and stretching, twisting and turning; etc.[ix] *"(See, e.g., Smith v. Midland Brake, Inc. (10th Cir. 1999) 180 F.3d 1154, 1161-1162; AKA v. Washington Hosp. Center (D.C. Cir. 1998) 156 F.3d 1284, 1300-1301 [332*

23

*App.D.C. 256].) More significantly, the third element discussed in Brundage establishing that an "adverse employment action" was caused by the employee's disability is irrelevant to this type of claim. Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself."* holding that a failure to accommodate is, in and of itself, an adverse employment consequence. [x] Besides Didlake said in writing that they could reasonably accommodate the plaintiff according to his *doctor letter,* **See ECF 4 Exhibit D, also See ECF 5 Exhibit** ***The plaintiff here was also given extra work to do on days he finished 30 minutes to an hour before clock-out time; he was told to stay busy. Didlake knew of the plaintiff's restriction and his disability accommodation letter first on, November 16th, 2018 and December 10th, 2018 of that same year). The Plaintiff was hired March 4th, 2019 and DIDLAKE refused to accommodate him. The plaintiff was hired by Didlake Inc, according to his doctor letter of his disabilities and limitations not Didlake Inc's made-up Employment Lawbook; and strip the plaintiff disability rights.***

Didlake failure to accommodate the plaintiff disabilities, *See ECF 4/5 Exhibits D/E;* caused significant painful stress to the plaintiff's body and health. The plaintiff also believes that his disability is why he did not receive the porter position. Knowing of the plaintiff medical conditions and disabilities before hiring the plaintiff, DIDLAKE INC, is responsible for failure and refusal to accommodate an employee with a Disability.[xi]

24

- ❖ **SUMMARY:** Case 8:2020-cv-03446-PWG has submitted substantial evidence showing that, he has a disability in accordance with *ADA Law*; and medical evidence that the plaintiff's doctor had written a letter with restrictions for the contract position in 2018 before he was hired in 2019. About the plaintiff's disability and the accommodations needed to be met; in walking, lifting, bending, twisting, breaks and climbing and so forth as stated: A.) The plaintiff Mr. Lester Fletcher did suffer while working for the Defendant in lifting, twisting and bending; B.) he was in pain sometimes throughout the whole day. The plaintiff, not being accommodated for his disability made it worse, C.) The plaintiff reported to his doctor at times of having difficulties getting out of bed some mornings, the plaintiff received a doctor letter later showing restrictions, dealing with back and thigh pains, D.) by law, failure to accommodate a disability claim is in adverse action itself. [xii] the plaintiff's doctor did not give a duration date for the plaintiff's to do regular duties while working for Didlake, E.) The plaintiff has also demonstrated that his contract (05203) was breached by Didlake, Incorporation.

## II. **CONCLUSION**

In light of the plaintiff's Amendment Complaint, the plaintiff moves the court to continues with his COMPEL and DICOVERY MOTION request.

25

Case No.: Civil No. 8:2020-cv-3446-PWG

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

And ask the court to grant the plaintiff a Jury Trial as well; and as an

alternative RELIEF; according to FEDERAL CIVIL RULE 8 (a) (2) and

REJECT the defendant's motion.

Respectfully Submitted,

Mr. Lester Fletcher 2/10/2021
LesterFletcherCareer@Gmail.com
Cellphone Number: 1-571-***-****
Pro Se Litigant 28 U.S. Code § 1654

**LETTER OF RECEIPT 2/12/2021**

MD Rules, Rule 2-126(**a**)

RULE 2-126. PROCESS—RETURN

26

Case No.: Civil No. 8:2020-cv-3446-PWG

1

2  **CLERK'S OFFICE**

3

4  **District Court of Maryland**

5  6500 Cherrywood Lane,

6  Greenbelt, Maryland 20770

7

8

9  **DIDLAKE, INC**

10  8641 BREEDEN AVENUE

11  Manassas, Virginia 20110

12

13

14

15

16

17

18

19

20  Respectfully Submitted,

21

22  Mr. Lester Fletcher 2/11/2021

23  LesterFletcherCareer@Gmail.com

   Cellphone Number: 1-571-***-****

24

25

26

27

28  III.   **FOOTNOTES:**

27

Case No.: Civil No. 8:2020-cv-3446-PWG